RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0001p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PATTI JO CAHOO and KRISTEN MENDYK, individuals; KHADIJA COLE, an individual and on behalf of similarly situated; HYON PAK; MICHELLE DAVISON,

*Plaintiffs-Appellees*,

*v.*

SAS ANALYTICS INC., et al.,

*Defendants*,

JULIE A. MCMURTRY (18-1295); STEVEN GESKEY, SHEMIN BLUNDELL, DORRIS MITCHELL, DEBRA SINGLETON, and SHARON MOFFET-MASSEY (18-1296),

*Defendants-Appellants*.

Nos. 18-1295/1296

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-10657—David M. Lawson, District Judge.

Argued:  October 18, 2018

Decided and Filed:  January 3, 2019

Before:  KEITH, CLAY, and NALBANDIAN, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Jason Hawkins, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants.  Kevin S. Ernst, ERNST & MARKO LAW, PLC, Detroit, Michigan, for Appellees.  **ON BRIEF:**  Jason Hawkins, Emily A. McDonough, Debbie K. Taylor, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants.  Jonathan R. Marko, MARKO LAW PLC, Detroit, Michigan, for Appellees.

---

**OPINION**

---

CLAY, Circuit Judge.    Julie McMurtry, Steven Geskey, Shemin Blundell, Dorris Mitchell, Debra Singleton, and Sharon Moffet-Massey (together the "Individual Agency Defendants") appeal the district court's decision denying their Motion to Dismiss ("Motion") based on qualified immunity, in this 42 U.S.C. § 1983 action alleging that the Individual Agency Defendants implemented and oversaw an automated computer system that falsely determined that Plaintiffs had committed unemployment insurance fraud and deprived Plaintiffs of protected property interests as a result of those erroneous fraud determinations, without providing Plaintiffs with adequate pre-deprivation notice, in violation of the Fourth and Fourteenth Amendments.[1]

For the reasons stated below, this Court **AFFIRMS IN PART**, and **REVERSES IN PART**, the district court's decision.  This Court **AFFIRMS** the district court's denial of the Individual Agency Defendants' Motion with respect to Plaintiffs' due process claim.  However, this Court **REVERSES** the district court's denial of the Motion with respect to Plaintiffs' equal protection and Fourth Amendment claims.

**STATEMENT OF FACTS**

**A.     Michigan's Automated System for Detection of Fraudulent Unemployment Benefits Claims**

The state of Michigan administers unemployment benefits to eligible claimants.  To receive benefits, claimants must demonstrate that they were employed by a covered employer, that they did not leave their employment because of work-related misconduct, and that they satisfy wage and income requirements.  Once claimants satisfy these eligibility requirements, they are entitled to benefits under state and federal law.

---

[1]The Court notes that Plaintiffs filed this case as a putative class action.  The district court has not yet certified the class.

In October 2013, Michigan's Unemployment Insurance Agency ("Agency") began administering Michigan's unemployment benefits system through an automated program called MiDAS. The Agency designed, created, and implemented MiDAS to render automated determinations of fraudulent conduct.[2] MiDAS searched for discrepancies in the records of individuals who were receiving—or who, in the six years prior to the program's introduction, had received—unemployment insurance benefits. The Agency had access to claimant records from employers, state agencies, and the federal government; it coordinated with those entities and "cross-checked" information about claimants that could affect their eligibility for benefits. (Compl. at PageID #763, ¶50.)

When MiDAS detected unreported income or "flagged" other information about a claimant, it initiated an automated process to determine whether the individual had engaged in fraudulent behavior. (*Id.* at ¶51.) For instance, MiDAS flagged claimants if it detected any discrepancy between information submitted by a claimant when applying for benefits and a record submitted by an employer. MiDAS did not investigate whether these discrepancies resulted from employer error or were the product of a good-faith dispute. MiDAS also flagged claimants through an "income spreading" formula; MiDAS calculated a claimant's income in a fiscal quarter and averaged the claimant's weekly earnings, even if the claimant did not actually make any money in a given week. (*Id.* at PageID #751, ¶8.) If the employee reported no income for any week during a quarter in which he or she earned income, MiDAS automatically determined that the claimant had engaged in fraud. The Agency made no effort to assess whether the claimant truthfully reported no income for the week(s) in question.

When a claimant was "flagged" for possible fraud, MiDAS did not inform the claimant about the basis for the Agency's suspicion or provide the claimant with any information to allow him or her to rebut the fraud charge. (*Id.* at PageID #764, ¶52.) MiDAS did not allow for a fact-based adjudication or give the claimant the opportunity to present evidence to prove that he or she did not engage in disqualifying conduct. Instead, MiDAS automatically sent claimants

---

[2]Other corporate and individual Defendants also participated in the design, implementation, and operation of MiDAS. But none of these Defendants are party to this appeal.

multiple-choice questionnaires. Claimants were told they had ten days to respond to the potential disqualification by answering the following questions:

> Did you intentionally provide false information to obtain benefits you were not entitle[d] to receive?
>
>     Yes    No
>
> Why did you believe you were entitled to benefits?
>
> 1. I needed the money
> 2. I had not received payment when I reported for benefits
> 3. I reported the net dollar amount instead of the gross dollar amount paid
> 4. I did not understand how to report my earnings or separation reason
> 5. I thought my employer reported my earnings for me
> 6. Someone else certified (reported) for me
> 7. Someone else filed my claim for me
> 8. Other

(*Id.* at PageID #764–65, ¶57.) The questionnaires did not provide the claimants with any information about why the Agency suspected they had engaged in fraud.

If a claimant answered any of the questions in the affirmative, or failed to respond to the questionnaire in ten calendar days, "MiDAS robo-adjudicated the fraud issue and automatically determined that the claimant knowingly and intentionally misrepresented or concealed information to unlawfully receive benefits." (*Id.* at PageID #765–66, ¶63.) From October 2013 to August 2015, MiDAS exclusively determined whether claimants engaged in fraud—no human being took part in this process.

MiDAS sent the questionnaires to claimants' accounts established online on the Michigan Web Account Management System. But many claimants' accounts were dormant; MiDAS reviewed unemployment benefits claims starting six years before MiDAS became operational, and many claimants did not have a reason to check their accounts. And MiDAS did not take any additional steps—such as sending emails, regular mail, or making phone calls—to notify claimants that the questionnaire had been sent.

When MiDAS determined that a claimant committed fraud, the individual's right to benefits terminated immediately. In addition, claimants were automatically assessed severe

monetary penalties: restitution and a penalty for fraudulent misrepresentation equal to four-times the amount of unemployment benefits received (or sought)—the maximum penalty permitted under state law. The Agency assessed the penalties even when claimants did not actually receive benefits. Many claimants were assessed penalties that ranged from $10,000 to $50,000. Some received penalties greater than $187,000.

After MiDAS determined that a claimant had committed fraud, the Agency automatically sent the claimant a statement letter. The letter demanded that the claimant repay benefits, penalties, and interest. The letter provided that "penalties for non-payment may include interception of the claimant's state income tax refund, interception of the claimant's federal income tax refund, garnishment of wages, and legal collection activity through a court of law." (*Id.* at PageID #767, ¶70.) The Agency often failed to send the letters, or sent them to the wrong address, because the Agency did not make any effort to verify that the statements were sent to the claimant's current address. The Agency also sent claimants a second form letter, titled a "Notice of Determination." (*Id.* at PageID #768, ¶80.) This letter stated, "Your actions indicate you intentionally misled and/or concealed information to obtain benefits you were not entitled to receive." (*Id.* at ¶81.) But the Notice of Determination letter did not inform claimants about the factual basis for the fraud determinations. The Notice of Determination letter also included a document titled "Restitution (List of Overpayment)," which contained the overpayment amount and demanded repayment of the benefits allegedly received and the statutory penalty. (*Id.* at PageID #768–69, ¶82.)

The only time real-life Agency employees evaluated a particular instance of suspected fraud was when a claimant filed an appeal. Claimants had 30 days to appeal the fraud determination to an Administrative Law Judge ("ALJ"). But "the vast majority" of claimants did not know about the fraud determination until the window to appeal had expired and they had been assessed thousands of dollars in fines. (*Id.* at PageID #778, ¶139; *id.* at PageID #769, ¶86.) And when claimants attempted to appeal, Agency employees informed them that they could not appeal because more than 30 days had passed, even if the claimants still had the right to appeal because they never received notice. Furthermore, according to the Michigan Auditor General, the Agency never answered over 90% of the calls to its "Help Line." (*Id.* at ¶141.) In fact, out

of the last 50,000 calls the "Help Line" received before the Auditor General conducted the audit, "not a single one had been answered or returned." (*Id.*)

To collect the penalties assessed through these false fraud determinations, the Agency garnished claimants' wages and intercepted their federal income tax returns. The Agency used these collection techniques without holding a hearing or otherwise giving the claimants an opportunity to contest the fraud determinations. This process not only affected current claimants—it could "occur at any time, up to six years after a claimant [had] stopped collecting benefits" and was no longer interacting with the Agency. (*Id.* at PageID #767, ¶75.) And the Agency made no attempt to consider the facts or circumstances of a particular case, or determine whether the alleged fraud was intentional, negligent, or simply accidental. Further, this system was deeply flawed; the Michigan Auditor General reviewed over 22,000 of MiDAS' fraud determinations and found that 93% of them did not actually involve fraud. In other words, 93% of MiDAS' fraud adjudications were false-positives.

Even after the Auditor General made its findings, the Agency continued to use MiDAS to attempt to detect fraud. While humans had some involvement, the process was still based around MiDAS' faulty algorithms. And Plaintiffs allege in their Complaint that, even with human involvement, approximately 50% of the fraud determinations were invalid.

**B.     False Fraud Determinations Directed to Plaintiffs**

Patti Jo Cahoo was erroneously determined to have filed a fraudulent unemployment benefits claim in 2014. She did not learn about the invalid fraud determination until December 2015, when her new application for unemployment benefits was denied. Cahoo was subsequently evicted from her home for failure to pay rent.

Kristen Mendyk received unemployment benefits from 2009 to 2010. Mendyk was falsely determined to have committed fraud. She was not notified of the invalid fraud determination until November 2016. The invalid fraud determination caused her to file for bankruptcy.

Khadija Cole received unemployment benefits from 2014 to 2015. In 2015, she received a letter stating that she had filed a fraudulent claim and owed approximately $29,000. Cole's fraud determination was erroneous. Prior to receiving the letter, Cole had never received notice of the false fraud determination.

Michelle Davison received a false fraud determination. She was not aware of the determination until she received a letter from the IRS indicating that it was seizing her tax refunds. The IRS seized Davison's state and federal income tax refunds from 2015 through 2016. Davison did not receive notice prior to the seizure.

Hyon Pak received a false fraud determination. He was not aware of the determination until he received a letter from the IRS indicating that it was seizing his tax refund. The IRS seized Pak's federal income tax refund from 2012 through 2014. Pak did not receive notice prior to the seizure.

**C.     Allegations Against the Individual Agency Defendants[3]**

Sharon Moffet-Massey was, at all relevant times, the head of the Agency. (*Id.* at PageID #782, ¶169.) Shemin Blundell directed the Agency's "Fraud Unit." (*Id.* at PageID #757, ¶17.) Debra Singleton served as the head of the "Benefit Overpayment Collection Unit." (*Id.* at

---

[3]The Individual Agency Defendants argue that the Court should overlook certain allegations in the Amended Complaint because "the allegations made in support of a particular count only apply to that count and Plaintiffs did not adopt any allegations [from other counts] by reference." (Defs. Br. at 27.) In other words, the Individual Agency Defendants contend that "the allegations supporting [Plaintiffs'] procedural due process, equal protection, and illegal seizure claims must be found within the specific counts presenting those claims." (*Id.*) According to the Individual Agency Defendants, the district court erroneously denied their qualified immunity affirmative defense because it improperly relied on facts only alleged in the substantive due process count.

The Court rejects the Individual Agency Defendants' argument. Contrary to their contention, a federal court may consider an entire complaint to determine whether a plaintiff pleaded plausible claims. *See Finley v. Huss*, 723 F. App'x 294, 297 (6th Cir. 2018) (citing *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016)) (explaining that at the motion to dismiss stage, "we accept the plaintiff's allegations as true, draw all reasonable inferences in favor of the plaintiff, and construe the *entire complaint* in the light most favorable to the plaintiff") (emphasis added); *Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 543 (6th Cir. 2015) (quoting *Moore v. City of Harriman*, 272 F.3d 769, 773 (6th Cir. 2001)) ("The court's function is to construe a complaint in order 'to do justice,' Fed. R. Civ. P. 8(e), and in doing so it must look to the complaint 'as a whole' to see if it provides 'sufficient notice' of the claim."); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (indicating that the inquiry at the motion to dismiss stage involves "[v]iewing the allegations of the complaint as a whole"). Therefore, the Court will consider conduct alleged throughout the entire Amended Complaint—regardless of what count it appears in—when evaluating Plaintiffs' claims.

PageID #782, ¶167.)  Dorris Mitchell was the head of the "Friend of the Court and Bankruptcy Unit." (*Id.* at PageID #757, ¶18.)  Steve Geskey served as a "high-ranking supervisor" for the Agency.  (*Id.* at ¶16.)  Julie McMurtry had an unspecified role at the Agency.  (*Id.* at PageID #779, ¶147.)

Moffet-Massey, Blundell, Singleton, Mitchell, Geskey, and McMurtry knew that there were "serious problem[s]" with MiDAS and that "the vast majority" of fraud determinations were invalid.  (*Id.* at PageID #757–58, ¶20; *id.* at PageID #780–81, ¶159.)  These problems were "widely-known" throughout the Agency.  (*Id.* at PageID #757–58 ¶20; *id.* at PageID #780–81, ¶159.)  Despite knowing of the high error rate and high percentage of erroneous fraud determinations, Moffet-Massey, Blundell, Singleton, Mitchell, Geskey, and McMurtry "changed nothing and forged ahead" with MiDAS.  (*Id.* at PageID #757–58, ¶20; *id.* at PageID #781, ¶161.)

Specifically, Geskey "ordered state attorneys general . . . to conduct business as usual" and to "continue to contest claimants' protests and appeals and [to] continue with collection activities" even though he knew the fraud determinations were false.  (*Id.* at PageID #781, ¶162; *id.* at PageID #757, ¶16.)  Mitchell "instructed various attorneys general to continue to oppose claimants' attempts to discharge fraud-based debt in bankruptcy proceedings by filing adversary proceedings, even when it was obvious that the underlying judgment . . . was based on an invalid fraud determination." (*Id.* at PageID # 781, ¶163.)  Singleton "continued to direct subordinates to pursue aggressive collection activities . . . includ[ing] tax refund intercepts and wage garnishments" even though he knew the "vast majority" of fraud adjudications were invalid.  (*Id.* at PageID #780–81, ¶159; *id.* at PageID #782, ¶167–68.)  Blundell "continued to instruct her subordinates, including the claims examiners, to pursue invalid fraud charges." (*Id.* at PageID #781, ¶164.)  Moffet-Massey "continued to pursue the same defective" policies despite knowing about MiDAS' problems and invalid fraud determinations.  (*Id.* at PageID #782, ¶169.)  And "when certain ALJs expressed concerns about the Agency's practices" due to the high rates of invalid fraud determinations, McMurtry removed them from hearing fraud cases.  (*Id.* at PageID #779, ¶147.)

# DISCUSSION

## Jurisdiction

"Under 28 U.S.C. § 1291, this Court has jurisdiction to hear an appeal only from a 'final decision' of the district court." *McCallum v. Geelhood*, No. 17-1418, 2018 WL 3738170, at \*4 (6th Cir. Aug. 6, 2018). "[M]ost denials of motions to dismiss are non-final orders that do not fall within Congress's statutory grant of appellate jurisdiction . . . ." *Courtright v. City of Battle Creek*, 839 F.3d 513, 517 (6th Cir. 2016) (citing 28 U.S.C. § 1291). "However, under the collateral-order doctrine[,] 'a limited set of district-court orders are reviewable' even though they are 'short of final judgment.'" *Peatross v. City of Memphis*, 818 F.3d 233, 239 (6th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009)). "Pursuant to the collateral-order doctrine, 'a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a final decision within the meaning of § 1291.'" *Courtright*, 839 F.3d at 517 (quoting *Iqbal*, 556 U.S. at 672). "We therefore have appellate jurisdiction over the district court's order denying the motion to dismiss based on qualified immunity." *Id.* at 517–18 (citing *Iqbal*, 556 U.S. at 672).[4]

## Standard of Review

This Court reviews *de novo* an appeal of the district court's denial of a motion to dismiss based on qualified immunity. *Courtright*, 839 F.3d at 518 (citing *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562 (6th Cir. 2011)). When reviewing an appeal of a denial of a motion to dismiss based on qualified immunity, this Court "appl[ies] the ordinary standard used in reviewing motions to dismiss . . . ." *Heyne*, 655 F.3d at 562 (citing *Back v. Hall*, 537 F.3d 552, 554–56 (6th Cir. 2008)). Therefore, "we construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all

---

[4]This Court has explained that a district court order denying qualified immunity is immediately appealable because:

> denials of qualified immunity . . . are part of a "'small class' of district court decisions that . . . 'finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.'"

*Geelhood*, 2018 WL 3738170, at \*4 (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996)).

reasonable inferences in favor of the plaintiff." *Courtright*, 839 F.3d at 518 (citing *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)).

## Analysis

The Court holds that qualified immunity does not protect the Individual Agency Defendants from Plaintiffs' due process claim because Plaintiffs plausibly alleged that the Individual Agency Defendants violated Plaintiffs' clearly-established due process rights. Conversely, qualified immunity protects the Individual Agency Defendants from Plaintiffs' equal protection claim because Plaintiffs failed to allege a plausible equal protection violation. Finally, qualified immunity protects the Individual Agency Defendants from Plaintiffs' Fourth Amendment claim because Plaintiffs failed to plausibly allege that the Individual Agency Defendants violated Plaintiffs' clearly-established Fourth Amendment rights.

## A.      Relevant Legal Principles

### 1.        Qualified Immunity

The doctrine of qualified immunity generally shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity 'gives ample room for mistaken judgments [and protects] all but the plainly incompetent or those who knowingly violate the law.'" *Essex v. Cty. of Livingston*, 518 F. App'x 351, 356 (6th Cir. 2013) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)).

This Court follows a "two-step inquiry" to determine whether qualified immunity applies. *Ferris v. City of Cadillac, Mich.*, 726 F. App'x 473, 478 (6th Cir. 2018) (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)). "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Seales v. City of Detroit, Mich.*, 724 F. App'x 356, 359 (6th Cir. 2018) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). This Court may address these prongs in either order. *Pearson v. Callahan*,

555 U.S. 223, 236 (2009).  "If either prong is not met, then the government officer is entitled to qualified immunity." *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018) (citing *Courtright*, 839 F.3d at 518).  "[T]he plaintiff bears the burden of showing that an officer is not entitled to the defense of qualified immunity." *Courtright*, 839 F.3d at 518 (citing *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)).

"A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "The Supreme Court has 'repeatedly told courts not to define clearly established law at a high level of generality.'" *Godawa v. Byrd*, 798 F.3d 457, 467 (6th Cir. 2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).  Nonetheless, "an official can be on notice that his conduct violates established law even in novel factual situations." *Littlejohn v. Myers*, 684 F. App'x 563, 569 (6th Cir. 2017) (quoting *Hope v. Pelzer*, 536 U.S. 730, 731 (2002)).  As this Court has stated, "the *sine qua non* of the 'clearly established' inquiry is 'fair warning.'" *Baynes*, 799 F.3d at 612–13 (quoting *Hope*, 536 U.S. at 741).  "There does not need to be 'a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate.'" *Morgan v. Fairfield Cty., Ohio*, 903 F.3d 553, 564 (6th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).[5]  "The relevant inquiry is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Baynes*, 799 F.3d at 610 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

"To determine whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of this [C]ourt and other courts within our circuit, and finally to decisions of other circuits." *Crawford v. Geiger*, 656 F. App'x 190, 198 (6th Cir. 2016) (quoting *Brown v. Lewis*, 779 F.3d 401, 418–19 (6th Cir. 2015) (internal

---

[5]The Individual Agency Defendants argue that Plaintiffs failed to "identify a case with a similar fact pattern" as required to defeat the Individual Agency Defendants' qualified immunity defense. (Defs. Br. at 37.)  The Individual Agency Defendants fail to recognize that *White v. Pauly*, 137 S. Ct. 548, 551 (2017)—one of the cases they cite to support their argument—explicitly rejects their assertion.  In *White*, the Supreme Court unequivocally proclaimed that "this Court's case law 'do[es] not require a case directly on point' for a right to be clearly established . . . [if existing precedent has] placed the statutory or constitutional question beyond debate.'" *White*, 137 S. Ct. at 551 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).  The Individual Agency Defendants' citation to *White* undermines their argument that qualified immunity applies here.

quotation marks omitted)). "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Seales*, 724 F. App'x at 365 (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).

## 2.     Qualified Immunity in the Context of a Motion to Dismiss

"To survive the motion to dismiss on qualified-immunity grounds, the plaintiff must allege facts that 'plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right.'" *Courtright*, 839 F.3d at 518 (quoting *Moseley*, 790 F.3d at 653); *see Heyne*, 655 F.3d at 562 (quoting *Hall*, 537 F.3d at 554) ("Just as we gauge other pleading-stage dismissals to determine only whether the complaint states a claim upon which relief can be granted, . . . so we review an assertion of qualified immunity to determine only whether the complaint adequately alleges the commission of acts that violated clearly established law."). "The test is whether, reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly established constitutional right." *Courtright*, 839 F.3d at 518 (quoting *Heyne*, 655 F.3d at 562–63).

"This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right." *Heyne*, 655 F.3d at 564 (emphasis in original) (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)). Accordingly, "[w]e must analyze separately whether [Plaintiffs] ha[ve] stated a plausible constitutional violation by each individual defendant . . . ." *Id*.

"[A]lthough an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Osberry v. Slusher*, No. 17-4242, 2018 WL 4360979, at *4 (6th Cir. Sept. 13, 2018) (quoting *Courtright*, 839 F.3d at 518); *see Kaminski v. Coulter*, 865 F.3d 339, 344 (6th Cir. 2017) (quoting *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015)) (stating that "it is 'generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of

qualified immunity,' [and we prefer] instead that courts resolve the issue at summary judgment.").

**B.      Application to the Matter at Hand**

**1.      The Individual Agency Defendants Are Not Entitled to Qualified Immunity With Respect to Plaintiffs' Due Process Claim**

Plaintiffs adequately alleged that the Individual Agency Defendants violated their right to procedural due process by terminating their eligibility for unemployment benefits and seizing their tax refunds without any meaningful pre-deprivation process. Further, Plaintiffs' rights to a pre-deprivation hearing were clearly established at the time of the Individual Agency Defendants' alleged actions. Accordingly, qualified immunity does not shield the Individual Agency Defendants from Plaintiffs' due process claim.

**a.      Plaintiffs Adequately Alleged that the Individual Agency Defendants Violated Their Right to Procedural Due Process**

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Chandler v. Vill. of Chagrin Falls*, 296 F. App'x 463, 468 (6th Cir. 2008) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)). "[E]ven the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 903 (6th Cir. 2014) (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)).

To state their procedural due process claim, Plaintiffs must establish three elements: (1) that they have a property interest protected by the Due Process Clause; (2) that they were deprived of this property interest; and (3) that the state did not afford them adequate pre-deprivation procedural rights. *Chandler*, 296 F. App'x at 469 (citing *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)).

###### i.      Plaintiffs Plausibly Alleged that the Individual Agency Defendants Deprived Them of Protected Property Interests

Plaintiffs established the first two elements of their procedural due process claim because they plausibly alleged that: (1) they maintained property interests in unemployment benefits, wages, and income tax return proceeds, and (2) the Individual Agency Defendants deprived them of those protected property interests.  Individual Agency Defendants do not challenge the fact that Plaintiffs possess protected property interests in their unemployment benefits, wages, or income tax returns.

Recipients of unemployment compensation have constitutionally-protected property interests in unemployment benefits.  *See Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (citing *Sherbert v. Verner*, 374 U.S. 398 (1963)); *Berg v. Shearer*, 755 F.2d 1343, 1345 (8th Cir. 1985) ("Unemployment benefits are a property interest protected by the due process requirements of the fourteenth amendment."); *Ross v. Horn*, 598 F.2d 1312, 1317–18 (3d Cir. 1979) ("[A]ppellants certainly have a property right in receiving unemployment benefits to which they are entitled by statute . . . [t]hus it is clear that they may not be deprived of this right without due process."); *Drumright v. Padzieski*, 436 F. Supp. 310, 319 (E.D. Mich. 1977) ("[T]he due process clause . . . appl[ies] to terminations of unemployment compensation benefits because they are statutorily created property interests, within the meaning of the Fifth and Fourteenth Amendments.").  Individuals also have constitutionally-protected property interests in their wages.  *See Sniadach v. Family Fin. Corp. of Bay View*, 395 U.S. 337, 342 (1969) ("Where the taking of one's property is so obvious, it needs no extended argument to conclude that absent notice and a prior hearing . . . this prejudgment garnishment procedure [of employee wages] violates the fundamental principles of due process.")  Individuals have protected property interests in their income tax returns.  *See generally Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (holding that an individual has a protected property interest in something if he or she has "a legitimate claim of entitlement to it."); *see In re Feiler*, 218 F.3d 948, 955 (9th Cir. 2000) ("[T]he right to receive a tax refund constitutes an interest in property[.]")

Plaintiffs sufficiently alleged that the Individual Agency Defendants deprived them of their protected property interests. Plaintiffs allege that all of the Individual Agency Defendants knew about the severe problems and inaccuracies with MiDAS. Plaintiffs further allege that, despite this knowledge, each Individual Agency Defendant did nothing to address MiDAS' obvious inaccuracies and continued to enforce its invalid fraud determinations. Furthermore, Plaintiffs allege specific conduct by each Individual Agency Defendant that deprived Plaintiffs of their protected property interests.

The Individual Agency Defendants assert that Plaintiffs failed to identify specific acts by each Individual Agency Defendant and instead improperly rely on their roles as managerial-level employees of the Agency. But contrary to the Individual Agency Defendants' contention, Plaintiffs alleged specific conduct by each Individual Agency Defendant.[6] While Plaintiffs will need to substantiate these allegations to survive a motion for summary judgment, the Court finds that Plaintiffs sufficiently alleged conduct by each Individual Agency Defendant to survive a motion to dismiss.

The Individual Agency Defendants also suggest that Plaintiffs failed to allege that the Individual Agency Defendants interfered with Plaintiffs' property rights because none of the named Plaintiffs alleged that the Agency terminated their unemployment benefits because of a

---

[6] Specifically, Plaintiffs assert that Geskey "ordered state attorneys general . . . to conduct business as usual" and to "continue to contest claimants' protests and appeals and continue with collection activities" even though he knew the fraud claims were false. (Compl. at PageID #781, ¶162; *id.* at PageID #757, ¶16.) Mitchell "instructed various attorneys general to continue to oppose claimants' attempts to discharge fraud-based debt in bankruptcy proceedings by filing adversary proceedings, even when it was obvious that the underlying judgment . . . was based on an invalid fraud determination." (*Id.* at PageID # 781, ¶163.) Singleton "continued to direct subordinates to pursue aggressive collection activities . . . includ[ing] tax refund intercepts and wage garnishments" even though he knew the "vast majority" of fraud adjudications were invalid. (*Id.* at PageID #780–81, ¶159; *id.* at PageID #782, ¶167–68.) Blundell "continued to instruct her subordinates, including the claims examiners, to pursue invalid fraud charges." (*Id.* at PageID #781, ¶164.) Moffet-Massey "continued to pursue the same defective" policies despite knowing about MiDAS' problems and invalid fraud determinations. (*Id.* at PageID #782, ¶169.) And "when certain ALJs expressed concerns about the Agency's practices" due to the high rates of invalid fraud determinations, McMurtry removed them from hearing fraud cases. (*Id.* at PageID #779, ¶147.)

The Individual Agency Defendants contend that Plaintiffs' failed to allege a plausible due process claim against McMurtry because Plaintiffs do not explicitly allege that McMurtry replaced the ALJs she removed with ALJs that lacked impartiality. But this omission does not preclude Plaintiffs' claim against McMurtry. At this stage, the Court must make all reasonable inferences in Plaintiffs' favor. *See Courtright*, 839 F.3d at 518 (citing *Treesh*, 487 F.3d at 476). The Court reasonably infers that McMurtry replaced the removed ALJs with ALJs who were not neutral. *See id.*

false fraud determination.  This argument lacks merit.  As noted above, Davison and Pak alleged that the Agency seized their tax refunds without prior notice or a hearing.  Further, Cahoo alleged that the Agency denied her second application for unemployment benefits after falsely determining that she committed fraud, which also constitutes a meaningful interference with a protected property interest.  Finally, Plaintiffs allege that their rights to receive benefits immediately terminated when the Agency determined that they had committed fraud; this would have precluded Plaintiffs from successfully filing for unemployment benefits subsequent to the false fraud determinations, despite the fact that Plaintiffs would have been entitled to the benefits under state and federal law if they met work and income requirements.  Accordingly, Plaintiffs have pleaded plausible interferences with their protected property interests.

### ii.    Plaintiffs Plausibly Alleged that the Individual Agency Defendants Did Not Provide Them With Adequate Pre-deprivation Notice Or an Opportunity to Be Heard

"[T]he Supreme Court has held that the hallmark of due process is that a deprivation of a property interest must be 'preceded by notice and opportunity for hearing appropriate to the nature of the case.'"  *Chandler*, 296 F. App'x at 470 (quoting *Loudermill*, 470 U.S. at 542).  "'[T]he root requirement' of the Due Process Clause [is] 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'"  *Loudermill*, 470 U.S. at 542 (emphasis in original) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).  The Supreme Court has instructed courts to consider three factors when determining whether an individual received sufficient process:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (citing *Goldberg*, 397 U.S. at 263–71).  "Applying this test, the [Supreme] Court has usually held that the Constitution requires some

kind of a hearing before the State deprives a person of liberty or property." *Chandler*, 296 F. App'x at 470 (quoting *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)).[7]

Plaintiffs pleaded a plausible procedural due process claim. First, Plaintiffs have a significant interest in maintaining eligibility for unemployment benefits, receiving ungarnished wages, and obtaining their state and federal income tax refunds. Second, the current system poses a profound possibility of erroneous deprivations—the Auditor General found that MiDAS' error rate exceeded 93%.[8] And while the government's legitimate interest in preserving fiscal and administrative resources cannot be ignored, this interest is not so great as to negate the need for adequate notice before interfering with these substantial property interests. Therefore, Plaintiffs adequately alleged that the Individual Agency Defendants did not provide them with sufficient process before depriving them of their protected property interests.

The Individual Agency Defendants argue that Plaintiffs failed to allege a plausible due process claim because Agency procedures provided for a pre-deprivation hearing if claimants elected to appeal a fraud determination. The Court is unpersuaded by this argument. Plaintiffs allege that the Agency terminated a claimant's right to benefits *before* any appeal hearing took place; they allege the Agency terminated a claimant's right to benefits immediately once MiDAS made a positive fraud determination. While claimants had the opportunity to appeal a fraud determination, "postdeprivation remedies alone will not satisfy due process if the deprivation

---

[7]While due process generally requires a pre-deprivation hearing, "[i]f an official's conduct would otherwise deprive an individual of procedural due process but is 'random and unauthorized,' the *Parratt* doctrine allows the state to avoid liability by providing adequate remedies after the deprivation occurs." *Valentino*, 756 F.3d at 901 (citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984)). Because neither party contends that the Individual Agency Defendants' actions were "random and unauthorized," the Court will not analyze whether available post-deprivation remedies satisfy due process.

[8]Plaintiffs allege that the Auditor General made this finding in August 2015. But Plaintiffs claim that the Auditor General examined fraud determinations made between "October 2013 nd [sic] October 2015." (Compl. at PageID #786, ¶77.) Obviously, a finding made in August 2015 could not have encompassed fraud determinations made through October 2015. The Individual Agency Defendants contend that this inconsistency prevents the Court from finding that this is a "well-pleaded" factual allegation. (Defs. Br. at 44.) While Plaintiffs' allegation lacks clarity with regard to the date of the Auditor General's finding, the Court will consider the rest of Plaintiffs' allegation as true—namely, that the Auditor General determined that 93% of fraud determinations were false—because at this stage the Court must view Plaintiffs' complaint in the light most favorable to Plaintiffs. *See Courtright*, 839 F.3d at 518 (citing *Treesh*, 487 F.3d at 476) (stating that at the motion to dismiss stage, a court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.").

resulted from conduct pursuant to an 'established state procedure,' rather than random and unauthorized conduct." *Valentino*, 756 F.3d at 905 (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435–36 (1982)). Accordingly, the adequacy of Plaintiffs' opportunity to appeal their original fraud determinations is immaterial to the question of whether the Individual Agency Defendants violated Plaintiffs' due process rights.

The Individual Agency Defendants' argument is unpersuasive for a second reason: even if Plaintiffs theoretically had the opportunity to attend an appeal hearing, they have sufficiently alleged that the Individual Agency Defendants failed to provide adequate notice prior to dispossessing Plaintiffs of their property rights, alleging the "vast majority" of claimants did not receive notice of the fraud determinations until the window to appeal had expired. *See*, *e.g.*, *United States v. Erpenbeck*, 682 F.3d 472, 476 (6th Cir. 2012) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)) ("Due process requires the government to provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of' a legal action that will determine their rights to property, and to 'afford them an opportunity to present their objections.'")

The Individual Agency Defendants also argue that Plaintiffs failed to state a plausible due process claim because they did not allege that their fraud determination letters were sent to an old address or their online Agency account. However, Plaintiffs allege that they never received notification of their fraud determinations until at least a year after the decisions were rendered (e.g. Patti Jo Cahoo, Kristen Mendyk, Khadija Cole) or until they received letters from the IRS notifying them that their tax refunds were being seized (e.g. Michelle Davison and Hyon Pak). Thus, the Court can reasonably infer that the Agency either sent no notifications to Plaintiffs, or sent notifications to their old addresses or dormant online Agency accounts.

Construing Plaintiffs' Complaint liberally and accepting Plaintiffs' allegations as true, as this Court must do at this stage, Plaintiffs sufficiently alleged that the Individual Agency Defendants violated their rights to due process. The Court will now address the second component of the qualified immunity analysis—whether Plaintiffs' due process rights were clearly established.

**b.    Plaintiffs' Due Process Rights Were Clearly Established When the Alleged Deprivations Occurred**

Plaintiffs' rights to adequate notice and a pre-deprivation hearing were clearly established. The Supreme Court long-ago proclaimed that "'the root requirement' of the Due Process Clause [is] 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Loudermill*, 470 U.S. at 542 (emphasis in original) (quoting *Boddie*, 401 U.S. at 379). It has been nearly fifty years since the Supreme Court held that recipients have a protected property interest in unemployment compensation. *See Goldberg*, 397 U.S. at 262 (citing *Sherbert*, 374 U.S. 398). Similarly, the Supreme Court held approximately five decades ago that the government violates due process by garnishing employee wages without holding a pre-deprivation hearing. *Sniadach*, 395 U.S. at 342. And because tax refunds are "significant property interests," it was also clearly established that Plaintiffs were entitled to a hearing before the Agency intercepted their tax refunds. *See Loudermill*, 470 U.S. at 542; *Boddie*, 401 U.S. at 379. Therefore, every reasonable Agency employee should have known that depriving Plaintiffs of their property interests without adequate notice or a meaningful opportunity to be heard violated due process. And, more specifically, every reasonable Agency employee should have realized that the flawed MiDAS system resulted in unconstitutional deprivations of protected property interests. MiDAS rendered a staggeringly high ratio of false fraud determinations, did not entail any meaningful fact-finding measures, and failed to provide adequate notice or an opportunity to be heard prior to terminating claimants' unemployment benefits, garnishing their wages, and seizing their tax returns. Accordingly, the Individual Agency Defendants are not entitled to qualified immunity on Plaintiffs' due process claim.

The Court rejects the Individual Agency Defendants' assertion that Plaintiffs' due process rights were not clearly established. The Individual Agency Defendants contend that Plaintiffs' due process rights were not clearly established because Plaintiffs failed to locate a case holding that a governmental official violates individuals' due process rights by "not ceasing to use the computerized system that its employing agency contracted for, based on reports of performance issues of the system . . . ." (Defs. Br. at 38.) The Individual Agency Defendants' argument is based on a fundamental misunderstanding of the doctrine of qualified immunity.

Contrary to the Individual Agency Defendants' contention, "an official can be on notice that his conduct violates established law even in novel factual situations." *Littlejohn*, 684 F. App'x at 569 (citing *Hope*, 536 U.S. at 731). The operative inquiry is not whether a previous court faced perfectly analogous facts—it is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Baynes*, 799 F.3d at 610 (quoting *Saucier*, 533 U.S. at 202). In this case, any reasonable official would have known that depriving Plaintiffs of their protected property interests in the manner alleged violated their due process rights.

If this Court accepted the Individual Agency Defendants' argument that Plaintiffs must identify cases with virtually identical facts to defeat a qualified immunity defense, this Court would enable state actors to violate citizens' constitutional rights with impunity simply by employing new technologies. This would give state actors a roadmap for evasion and effectively insulate them from any liability—they would use new technologies to carry out unconstitutional conduct, and avoid liability based on qualified immunity, even when the underlying conduct is clearly unconstitutional. The Court rejects the Individual Agency Defendants' invitation to allow state actors to evade liability by utilizing new technologies to effectuate unconstitutional conduct.

The Individual Agency Defendants attempt to hide behind MiDAS. They claim that MiDAS—not the Individual Agency Defendants—caused the unconstitutional deprivations that Plaintiffs allege. On one level, this argument superficially appears to be correct—MiDAS rendered the false fraud determinations, not the Individual Agency Defendants. But this argument conveniently ignores the fact that the Individual Agency Defendants implemented and oversaw MiDAS, and prescribed its operation. MiDAS did not create itself. And it did not enforce the false fraud determinations that it automatically rendered—the Individual Agency Defendants did. The Court rejects the Individual Agency Defendants' attempt to evade responsibility for their actions by deflecting blame away from themselves and onto the computerized system that they implemented and oversaw, and whose invalid fraud determinations they knowingly enforced.

### 2.   The Individual Agency Defendants Are Entitled to Qualified Immunity With Respect to Plaintiffs' Equal Protection Claim

Plaintiffs failed to state a plausible equal protection claim because Plaintiffs failed to plausibly allege that the Individual Agency Defendants intentionally singled them out for discriminatory treatment, which Plaintiffs would have had to allege to sustain a "class of one" equal protection claim.   Accordingly, qualified immunity shields the Individual Agency Defendants from Plaintiffs' "class of one" equal protection claim.

#### a.   Plaintiffs Failed to Allege a Plausible Equal Protection Claim

"The Equal Protection Clause safeguards against the disparate treatment of similarly situated individuals as a result of government action that 'either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Paterek v. Vill. of Armada, Michigan*, 801 F.3d 630, 649 (6th Cir. 2015) (quoting *Ctr. for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011)).   Plaintiffs do not allege that the Individual Agency Defendants violated a fundamental right.   Nor do Plaintiffs contend that they belong to a suspect class.   Instead, Plaintiffs assert what the Supreme Court has described as a "class of one" theory.   *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

"Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."   *Id.* "A 'class of one' plaintiff may demonstrate that government action lacks a rational basis either by negativing every conceivable basis which might support the government action, or by showing that the challenged action was motivated by animus or ill-will."   *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty., Ohio*, 430 F.3d 783, 788 (6th Cir. 2005) (citing *Warren v. City of Athens, Ohio*, 411 F.3d 697, 710–11 (6th Cir. 2005)).   Plaintiffs rely on the former theory. Specifically, they claim that the Individual Agency Defendants treated them differently than similarly situated persons—the claimants whose applications were reviewed by humans prior to the implementation of MiDAS—and that this difference in treatment lacked a rational basis because of the widespread problems with MiDAS.

The Court finds that Plaintiffs failed to state a plausible class of one equal protection claim. Plaintiffs have not alleged that they were "intentionally singled out by the government for discriminatory adverse treatment." *See TriHealth*, 430 F.3d at 788. Rather, Plaintiffs allege that the Individual Agency Defendants implemented and administered a poorly-conceived policy that applied equally to all claimants who applied for unemployment benefits during the relevant period. Plaintiffs have not alleged that the policy in question specifically targeted them as a result of Defendants' animus or ill-will as would be required by a "class of one" equal protection theory. For this reason, Plaintiffs cannot demonstrate that they were "intentionally treated differently from others similarly situated." *Vill. of Willowbrook*, 528 U.S. at 564. Therefore, Plaintiffs failed to state a plausible class of one equal protection claim. Accordingly, qualified immunity protects the Individual Agency Defendants from this claim. Further, because Plaintiffs failed to state a plausible equal protection claim, the Court need not proceed to the second step of the qualified immunity analysis.

**3.      The Individual Agency Defendants Are Entitled to Qualified Immunity With Respect to Plaintiffs' Fourth Amendment Claim**

Plaintiffs claim that the Individual Agency Defendants violated the Fourth Amendment by dispossessing Plaintiffs of their property interests in unemployment benefits, wages, and income tax refunds based on invalid fraud determinations. The Individual Agency Defendants do not dispute that Plaintiffs' protected property interests were seized. But the Individual Agency Defendants claim that Plaintiffs failed to demonstrate that their rights were "clearly established in the circumstances of this case." (Defs. Br. at 40.) The Court agrees. The Court need not decide whether the Individual Agency Defendants violated Plaintiffs' Fourth Amendment rights because Plaintiffs' Fourth Amendment rights were not clearly established. *See Miami Univ.*, 882 F.3d at 604.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566

(6th Cir. 2016). "When assessing whether a Fourth Amendment violation has occurred, 'the ultimate touchstone' of the inquiry 'is reasonableness.'" *Partin v. Davis*, 675 F. App'x 575, 582 (6th Cir. 2017) (quoting *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010)). The Supreme Court has held that the Fourth Amendment applies when the government seizes private assets to satisfy a debt owed to the government. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 50 (1993); *G. M. Leasing Corp. v. United States*, 429 U.S. 338, 354 (1977). However, a warrantless seizure does not violate the Fourth Amendment if the seizure "does not involve an invasion of privacy." *G. M. Leasing Corp.*, 429 U.S. at 352 (holding that IRS agents did not violate the Fourth Amendment by seizing vehicles to satisfy a debt because the seizures occurred on public streets and therefore did not violate the debtor's privacy rights.) Furthermore, this Court has held, albeit in an unpublished opinion, that the IRS does not violate the Fourth Amendment by seizing a debtor's securities without a warrant when the seizure does not violate the debtor's privacy rights. *Sachs v. U.S. ex rel. I.R.S.*, 59 F. App'x 116, 119 (6th Cir. 2003) (unpublished table opinion) (citing *G. M. Leasing Corp.*, 429 U.S. at 351) (holding that the IRS did not violate the Fourth Amendment by seizing the debtor's securities from a brokerage firm and explaining that "the IRS does not need judicial authorization to simply seize property where it does not intrude on privacy rights.")

The Court has not located a published opinion from this Circuit that answers the question of whether government actors violate the Fourth Amendment by seizing assets without a warrant if the seizure does not violate privacy interests. However, even if the Individual Agency Defendants' conduct violated the Fourth Amendment—an issue that this Court does not now decide—Plaintiffs' Fourth Amendment rights were not clearly established in light of the Supreme Court's decision in *G. M. Leasing Corp.* and this Court's decision in *Sachs*. Accordingly, qualified immunity shields the Individual Agency Defendants from Plaintiffs' Fourth Amendment claims. *See Miami Univ.*, 882 F.3d at 604.

## C.      Summary

The Court appreciates that an "officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point . . . ." *Osberry*, 2018 WL 4360979, at *4 (quoting *Courtright*, 839 F.3d at 518). But this Court has repeatedly stated that the earliest

possible point for evaluating a qualified immunity defense "is usually summary judgment and not dismissal under Rule 12." *Id.* (quoting *Courtright*, 839 F.3d at 518); *see Kaminski*, 865 F.3d at 344 (quoting *Campbell*, 779 F.3d at 433). If Plaintiffs hope to survive a motion for summary judgment, they will need to provide evidence to support their allegations, particularly in regards to the actions taken by each Individual Agency Defendant. But at this early stage, the Court finds that Plaintiffs' well-pleaded facts sufficiently allege that each Individual Agency Defendant violated Plaintiffs' clearly-established due process rights by implementing, overseeing, and continuing to enforce a government program that substantially interfered with Plaintiffs' property interests, despite knowing that the program rendered an exceptionally high percentage of invalid fraud determinations. For these reasons, the Court finds that qualified immunity does not shield the Individual Agency Defendants at this stage of the litigation with respect to Plaintiffs' due process claim.

## CONCLUSION

This Court holds that qualified immunity does not shield the Individual Agency Defendants from Plaintiffs' due process claim. However, the Court finds that qualified immunity protects the Individual Agency Defendants from Plaintiffs' equal protection and Fourth Amendment claims. Therefore, this Court **AFFIRMS** the district court's order with respect to Plaintiffs' due process claim and **REVERSES** the district court's order with respect to Plaintiffs' equal protection and Fourth Amendment claims. Accordingly, the Court **REMANDS** this matter for further proceedings consistent with this opinion.