RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0007p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

SHANE ANDERS; STAR TOWING AND RECOVERY, LLC;
AREA TOWING AND RECOVERY,

*Plaintiffs-Appellees*,

*v.*

TONY CUEVAS and DARZEIL HALL (19-2191); HERMAN
RAMIK (20-1166); RICK SOLLARS (20-1165),

*Defendants-Appellants*.

Nos. 19-2191/20-1165/1166

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:19-cv-10989—George Caram Steeh, III, District Judge.

Decided and Filed:  January 8, 2021

Before:  KETHLEDGE, DONALD, and LARSEN, Circuit Judges.

———————————

## COUNSEL

**ON BRIEF:**  Eric M. Jamison, OFFICE OF THE MICHIGAN ATTORNEY GENERAL,
Lansing, Michigan, for Appellants in 19-2191.  John C. Clark, Geoffrey S. Wagner,
GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellants in 20-1165 and
20-1166.  Andrew A. Paterson, Ann Arbor, Michigan, for Appellees.

———————————

## OPINION

———————————

BERNICE BOUIE DONALD, Circuit Judge.  In these consolidated interlocutory
appeals, Defendant-Appellants challenge the district court's orders denying them a variety of
asserted immunities as to Plaintiff-Appellees' claims under 42 U.S.C. § 1983 and Plaintiff-

Appellees' defamation claim.  We **AFFIRM** in part, **REVERSE** in part, and **VACATE** in part the district court's denial of qualified immunity in Case No. 19-2191 and **AFFIRM** the district court's denial of immunities in Case Nos. 20-1165 and 20-1166.

## I.  BACKGROUND

### A.     Facts

The following facts are taken from Appellees' Amended Complaint and are accepted as true for purposes of this appeal.  Plaintiff-Appellee Shane Anders ("Anders") is the owner of two towing and storage companies, Plaintiff-Appellees Star Towing and Recovery, LLC ("Star Towing") and Area Towing and Recovery, Inc. ("Area Towing") (collectively, "Appellees"). When Anders purchased Star Towing in 2015, Star Towing had already been contracted to conduct tows on behalf of the Michigan State Police for nearly 15 years and was on the state's non-preference tow rotation list for its Monroe County Post ("Monroe Post").  After Anders took ownership of Star Towing, the relationship between Star Towing and state police gradually declined.  In December 2015, a member of the state police's internal affairs division approached Anders regarding tickets to sporting events that Anders had provided to state troopers.  Anders informed the investigator that he kept a list of the troopers to whom he had given tickets and provided the investigator with that list.  What transpired as to this investigation over the next two years is not clear, but in November 2017, Anders again met with investigators to further discuss the tickets.  He provided state investigators with a more detailed list of approximately 18 state troopers to whom he had given tickets.  Anders also assured the investigators that neither he nor his tow companies received any special treatment in return for the tickets.

Each of the 18 troopers who accepted tickets received verbal and/or written reprimands from their superiors as a result of receiving the tickets.  The troopers and other state police administrators were not happy that Anders disclosed their names.  Defendant-Appellant Tony Cuevas ("Cuevas"), the commander for the Monroe County Post, was particularly aggrieved.  On March 15, 2018, Cuevas sent Anders a letter informing him that he was removing Star Towing from the non-preference tow rotation list for the Monroe Post.

The fallout from the state investigation also affected Area Towing, which is on the state tow rotation. Defendant-Appellant Darzeil Hall ("Hall") was one of the troopers whose name was revealed to investigators. Subsequently, Hall has pressured the staff of Area Towing to schedule and hold its auctions on weekdays. This is a problem for Area Towing, which has far greater availability to hold its auctions on the weekends. Yet, Hall has "harass[ed] and badger[ed]" Area Towing staff to move the auctions. [R. 30, PageID 259]. Appellees assert that Hall is attempting to create pretext for removing Area Towing from the state towing rotation.

In a separate and simultaneous battle, Appellees are having problems with the City of Taylor, Michigan ("Taylor"). For 20 years, Area Towing has provided towing services to Taylor. On November 1, 2007, Area Towing entered into an exclusive three-year contract with Taylor to provide towing services. At Taylor's discretion, that contract was renewed twice, giving Area Towing an exclusivity arrangement with Taylor through November 1, 2016.

In the summer of 2016, Defendant-Appellant Rick Sollars ("Sollars"), the Mayor of Taylor, required that Area Towing use Gasper Fiore's company, B&T Towing, for certain heavy-duty tows. Anders expressed reservations in working with Fiore, who at the time was under federal criminal investigation for involvement in a towing scandal. Specifically, Anders "expressed to both the former Taylor Chief of Police . . . and corporation counsel for the City of Taylor that [he] did not feel comfortable using any company owned by Gasper Fiore to facilitate heavy-duty tows." When he let it be known that he did not want to work with Fiore, Anders was advised that it would be "in his best interest" to do so and, that if he did not, Taylor would not renew his contract.[1]

On October 18, 2016, with the latest installment of the contract facing expiration, the Taylor City Council approved a resolution to allow Area Towing to continue providing services on a month-to-month basis so that Taylor would have time to issue a request for proposal ("RFP") before administering a new contract. On November 14, 2016, the city council issued the RFP, with proposals due on December 1, 2016.

---

[1]Appellees do not put forth any allegations as to who it was specifically that made these statements to Anders.

Appellees claim that Sollars crafted the RFP in a way that would eliminate Area Towing from consideration so that Taylor would steer more of its towing services to Fiore's company. They figure as much because the former Taylor police chief advised them that Sollars personally directed her to change the RFP to place a heavier emphasis on heavy-duty towing capabilities, despite her advice that such emphasis was not necessary given the infrequency of heavy-duty tows. Even though Anders believed Sollars was rigging the process, Anders and Area Towing submitted a timely proposal in response to the RFP.

On May 31, 2017, Fiore was indicted by a federal grand jury, and Anders reiterated his discomfort in having to continue to use B&T Towing for heavy-duty tows. However, shortly after Fiore's indictment, B&T was no longer an authorized tower for the state police, and Area Towing no longer had to use its services. In December 2017, a published article identified Anders as an individual who had been recorded on a federal wiretap speaking to Fiore. The FBI and the U.S. Attorney's Office then interviewed Anders, and, during those conversations, Anders revealed to federal agents that he had no choice but to work with Fiore or else Fiore would notify Sollars, which would put Area Towing's business with the city at risk. On March 8, 2018, Anders' defense attorney received a call from the U.S. Attorney's Office notifying him that Anders could publicly reveal that he was not a target of the federal criminal investigation involving Fiore.

On March 20, 2018, the city council rejected Sollars' request to approve three tow companies that had submitted proposals in response to the RFP. Instead, by a 5–2 vote, the city council voted to approve another three-year towing contract for Area Towing. On March 23, 2018, Sollars, exercising his powers as mayor under the city charter, vetoed the March 20, 2018 resolution, which meant that Area Towing would remain on a month-to-month contract with the city. Appellees claim that Sollars executed the veto because Anders had refused to give him campaign contributions, complained about using Fiore's company, and provided information to the FBI and U.S. Attorney's Office about Sollars' conduct.

Enter Defendant-Appellant Harold "Butch" Ramik ("Ramik"), a member of the city council. Ramik contacted a reporter from Fox 2 News, which then aired a story on March 27, 2018 in which Ramik claimed to have received complaints from residents about Area Towing

and accused Anders of victimizing and stealing from the city.  After the story aired, Ramik told city officials and residents that Anders was a "crook" and that he was going to "destroy" Anders and Area Towing.

Despite a tumultuous relationship with various city officials throughout the remainder of 2018,[2] Area Towing is still providing month-to-month services to Taylor, in accordance with the October 18, 2016 resolution of the city council.

### B.      Procedural History

On April 4, 2019, Appellees filed suit under 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments.  In Count I, Anders and Star Towing brought a First Amendment retaliation claim against Cuevas for removing Star Towing from the Monroe Post. In Count II, Anders and Area Towing brought a First Amendment retaliation claim against Hall for his "constant[] pressure" and "harassment" of Area Towing.  In Count III, Anders brought an Equal Protection claim against Cuevas for removing Star Towing from the Monroe Post.  In Count IV, Anders brought a First Amendment retaliation claim against Sollars, in both his individual and official capacities, and the City of Taylor for Sollars' vetoing of the three-year contract that the city council had approved for Area Towing.[3]

On May 30, 2019, the City of Taylor, Sollars, and Ramik, together, filed a motion to dismiss.  On June 13, 2019, Cuevas and Hall ("County-Appellants") filed a separate motion to dismiss, asserting that they were each entitled to qualified immunity on all Counts.  On September 12, 2019, the district court dismissed Anders' individual claims in Counts I, II, and IV because he lacked standing to bring those claims on his own behalf rather than as an agent of the towing companies.  The district court also granted Cuevas qualified immunity on Count I

---

[2]Although not essential to resolution of these appeals, Appellees alleged Ramik moved to terminate Area Towing's contract with the City of Taylor on October 16, 2018.  The motion failed, but Appellees claim that Ramik took this action in retaliation for Anders' criticism of Ramik at a city council meeting.  These facts colored Area Towing's First Amendment retaliation claim (Count V) against Ramik and the City of Taylor, but because the district court dismissed that claim—and it is not the subject of this appeal—we include these details only for additional background information.

[3]The original Complaint also named Ramik as a defendant, but neither the allegations nor the claims asserted made any mention of him.

"with respect to the claim that he retaliated against [Appellees] as a result of Anders' failure to comment to the media." The district court also dismissed claims against Ramik without prejudice. The motions were otherwise denied.

On October 8, 2019, the district court denied a motion for reconsideration filed by the City of Taylor, Sollars, and Ramik. On October 15, 2019, Appellees filed the Amended Complaint, curing the standing issues by removing Anders as an individual plaintiff from Counts I, II, and IV. Appellees added Count V, a First Amendment retaliation claim brought by Area Towing against Ramik, in both his individual and official capacities, and the City of Taylor. Appellees also added Count VI, in which Anders and Area Towing brought a defamation claim against Ramik, based on the statements he made to Fox 2 News and other statements made about Anders.

On November 1, 2019, the City of Taylor, Sollars, and Ramik moved collectively for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Sollars asserted both absolute immunity and qualified immunity, while Ramik asserted governmental immunity under Michigan law. On January 23, 2020, the district court dismissed all claims against the City of Taylor, dismissed the official capacity claims against Sollars and Ramik, and otherwise denied the motion.

Appellees' suit has thus been trimmed to the following claims:

1) Star Towing's First Amendment retaliation claim against Cuevas (Count I);
2) Area Towing's First Amendment retaliation claim against Hall (Count II);
3) Anders' Equal Protection claim against Cuevas (Count III);
4) Area Towing's First Amendment retaliation claim against Sollars in his individual capacity (Count IV); and
5) Anders' and Area Towing's defamation claims against Ramik (Count VI).

On appeal, County-Appellants appeal the district court's denial of qualified immunity (Case No. 19-2191), Sollars appeals the district court's denial of absolute immunity and/or qualified immunity (Case No. 20-1165), and Ramik appeals the district court's denial of governmental immunity (Case No. 20-1166). We address each appeal in turn to determine if Defendant-Appellants are entitled to any of these immunities.

## II.  STANDARD OF REVIEW

County-Appellants' Appeal stems from the district court's denial of their motion to dismiss.  This Court reviews *de novo* an appeal of the district court's denial of a motion to dismiss based on qualified immunity.  *Courtright v. City of Battle Creek*, 839 F.3d 517, 518 (6th Cir. 2016) (citing *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562 (6th Cir. 2011)).  When reviewing an appeal of a denial of a motion to dismiss based on qualified immunity, this Court "appl[ies] the ordinary standard used in reviewing motions to dismiss . . . ."  *Heyne*, 655 F.3d at 562 (citing *Back v. Hall*, 537 F.3d 552, 554-56 (6th Cir. 2008)).  Therefore, "we construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff."  *Courtright*, 839 F.3d at 518 (citing *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)).

Sollars' and Ramik's respective appeals stem from the district court's denial of their motion for judgment on the pleadings.  We review a district court's judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure under the same *de novo* standard as we review a decision granting a motion to dismiss under Rule 12(b)(6).  *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 284 (6th Cir. 2010).  Judgment on the pleadings is proper "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law."  *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991).  The "complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory."  *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007).  Accordingly, we construe the complaint in the light most favorable to the nonmoving party, accept the well-pled factual allegations as true, and determine whether the complaint contains enough facts to make the legal claims facially plausible.  *Id.*  (citing *United States v. Moriarty*, 8 F.3d 329, 332 (6th Cir. 1993)).

### III.     Case No. 19-2191 (COUNTY-APPELLANTS)

#### A.     First Amendment Retaliation Claims Against County-Appellants (Counts I and II)

We review *de novo* a district court's denial of a motion to dismiss invoking qualified immunity. *Coley v. Lucas Cnty.*, 799 F.3d 530, 536 (6th Cir. 2015). Although orders denying motions to dismiss are generally not "final decisions" reviewable under 28 U.S.C. § 1291, we recognize an exception for orders denying qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). "[T]his exception is a narrow one. A denial of a claim of qualified immunity is immediately appealable only if the appeal is premised not on a factual dispute, but rather on 'neat abstract issues of law.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Johnson v. Jones*, 515 U.S. 304, 317 (1995)).

As we have repeatedly cautioned, "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's 'entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point,' that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (brackets and citation omitted) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003)); *see also Guertin v. Michigan*, 912 F.3d 907, 917 (6th Cir. 2019); *Courtright*, 839 F.3d at 518. "[I]t is often perilous to resolve a Rule 12(b)(6) motion on qualified immunity grounds" because development of the factual record is frequently necessary to decide whether the official's actions violated clearly established law. *Singleton v. Kentucky*, 843 F.3d 238, 242 (6th Cir. 2016).

To defeat a claim of qualified immunity, the plaintiff must show that the official's conduct (1) violated a constitutional right that (2) was clearly established. *See Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 897 (6th Cir. 2019). As with any other motion to dismiss, we perform this analysis while accepting the plaintiff's factual allegations as true and drawing all reasonable inferences in his favor. *See Courtright*, 839 F.3d at 518. We ask only whether, "reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly established constitutional right." *Cahoo*, 912 F.3d at 899 (quoting *Courtright*, 839 F.3d at 518). "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A *prima facie* First Amendment retaliation claim requires the towing companies to establish three elements: "(1) [that they] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against [them] that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) . . . the adverse action was motivated at least in part by [their] protected conduct." *Dixon v. Univ. of Toledo,* 702 F.3d 269, 274 (6th Cir. 2012). The Amended Complaint plausibly alleges all three elements as to Count I, but not Count II.

### 1. Protected Activity

The towing companies' respective First Amendment claims against County-Appellants implicate the same alleged protected activity—Anders' speech (as an agent of each company) in the state's internal affairs investigation. Thus, we must ask whether Anders' revealing of the names to investigators is conduct protected by the First Amendment.

"The First Amendment protects speech that may be 'fairly characterized as constituting speech on a matter of public concern.'" *Lucas v. Monroe Cnty.*, 203 F.3d 964, 973-74 (6th Cir. 2000) (quoting *Chappel v. Montgomery Cnty. Fire Protection Dist. No. 1*, 131 F.3d 564, 573 (6th Cir. 1997)). "In order to conclude that speech addresses a matter of public concern, this court must be able to fairly characterize the expression as relating to any matter of political, social, or other concern to the community." *Id.* at 973 (citations omitted). "[A]llegations of corrupt practices by government officials are of the utmost public concern." *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1061 (3d Cir. 1989).

With those core free speech principles in mind, we said in *Marohnic v. Walker*, 800 F.2d 613 (6th Cir. 1986), that "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Id.* at 616. In that case, we reversed a grant of summary judgment in favor of a state mental-health board after finding that the board violated the First Amendment by firing an employee who had spoken to police officers regarding a criminal investigation of the board. *Id.* at 617. In holding that the employee's firing

was impermissibly motivated by his cooperation with law enforcement, we emphasized that the employee's speech was "made in the context of a state investigation" and that First Amendment-protected activity included "speech which exposed graft and corruption in government." *Id.* at 616.

Building on *Marohnic*, we held in *See v. City of Elyria*, 502 F.3d 484 (6th Cir. 2007) that a police officer engaged in First Amendment-protected activity when he spoke to the FBI about alleged corruption in his police department's investigations, grand jury proceedings, funding, and conduct with the press. In doing so, we said that "[s]tatements exposing possible corruption in a police department are exactly the type of statements that demand strong First Amendment protections." *Id.* at 493.

Here, Anders' speech—as alleged—was "made in the context of a state investigation." Presumably, the focus of the state's investigation was whether the officers had engaged in any illegal conduct by accepting the tickets from Anders. Thus, in cooperating with law enforcement and providing details and names of the offending officers, Anders was helping illuminate investigators as to "possible corruption" within the state police department, which fits squarely within the type of speech that we have in the past deemed to be protected.

### 2. Adverse Action

The towing companies next must show that County-Appellants, respectively, took "adverse actions" against them. This Court has described an adverse action as "one that is '*capable* of deterring a person of ordinary firmness' from exercising the constitutional right in question." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (citation omitted). We have also held that nothing justifies "harassing people for exercising their constitutional rights," so the deterrent effect on speech "need not be great" to be actionable. *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999) (en banc) (citation omitted).

As to Star Towing's claim against Cuevas, we have a case directly on point. In *Lucas*, we found that a county took adverse action against a wrecker service and its operator when the county removed them from the sheriff department's standby towing service call list following the operator's public criticism of the sheriff. 203 F.3d at 974. We explained that "[t]here is no

doubt that such conduct would deter the average wrecker service operator from voicing similar criticisms of the Sheriff." *Id.* Because Star Towing alleges that it was subject to an identical injury—the loss of business with Monroe County—Cuevas' removal of Star Towing from the non-preference list—if proven true—amounts to an adverse action.

In contrast, Hall's alleged "constant pressure" and "badgering" of Area Towing are not sufficiently alleged adverse actions. Merely "inconsequential" actions that cause a "de minimis" injury are not adverse actions. *See Wurzelbacher v. Jones-Kelly*, 675 F.3d 580, 584 (6th Cir. 2012). Here, the Amended Complaint alleges only a de minimis injury against Hall. His pressure did not force Area Towing to hold its auctions during the week. In fact, Plaintiffs "were allowed to hold weekend auctions" even after Anders gave names of troopers to investigators. [R. 30, PageID 259]. Hall's pressure likewise did not cause the removal of Area Towing from the State Police's rotation list; nor does the Amended Complaint allege that Hall exercised any influence over that list. Area Towing therefore lost no "opportunity to receive business" nor suffered a threat to its economic livelihood. *Lucas*, 203 F.3d at 974. Thus, Area Towing failed to allege that Hall engaged in an adverse action, and we reverse the district court's judgment as to Count II.[4]

### 3. Causation

As to the final element, Star Towing must establish a causal connection between Anders' protected speech and Cuevas' actions. To establish causation, Star Towing must demonstrate that its protected speech was "a substantial or motivating factor" of the adverse action. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)). This inquiry is "essentially but-for cause." *Id.* (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)). "There is some uncertainty in our cases over whether a plaintiff must prove this but-for test or whether the plaintiff need only show that the protected conduct was a motivating factor for the action (which switches the burden to the defendant to prove the absence of but-for causation)." *Rudd v. City of Norton Shores*, 977 F.3d 503, 515 (6th Cir. 2020). Either way, the complaint sufficiently alleges the causal connection.

---

[4]Because Area Towing's claim against Hall fails at the second element, we need not address causation or whether Hall's actions—as alleged—amounted to a violation of clearly established law.

Cuevas contends that Anders' participation in the investigation could not have been even a motivating factor in Star Towing's removal from the non-consent tow list, because the time between Anders' first alleged protected speech on December 14, 2015 and Star Towing's removal in March 2018 is too long a period of time to infer causation. While in certain circumstances, "a lack of temporal proximity alone can be fatal to an attempt to establish a causal connection[,]" *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675-676 (6th Cir. 2013), Cuevas acknowledges that the applicable timeline is actually much more narrow. As conceded by Cuevas, Anders met again with state investigators on November 14, 2017—just four months before Star Towing was removed from the towing list. [County-Appellants' Br. at 18-20]. The Amended Complaint does not reveal exactly when the state investigators completed the ticket investigation nor when the offending officers received reprimands. All that we can glean from the allegations is that on December 21, 2015, Anders provided state investigators with the names of the troopers and that on November 14, 2017, he produced those names in a more formal written list. While it is possible that the officers may have been reprimanded sometime between the December 21, 2015 meeting but before the November 14, 2017 meeting, we cannot make that inference in Cuevas' favor at this time. Reading the allegations in the light most favorable to Star Towing, we must infer that the state investigation was not completed until after November 14, 2017 and that, despite Anders' revelation of the officer names two years earlier, those officers might not have been implicated and subsequently reprimanded until sometime after November 14, 2017. As such, the timing of Star Towing's removal from the tow list, coupled with statements and circumstances during the state investigation, create a reasonable inference at this early stage in litigation that Cuevas' retaliatory motive caused the adverse action.[5]

### 4. Qualified Immunity

During the time period described in the Amended Complaint, it was clearly established, broadly speaking, that retaliation for protected speech violates the Constitution. Without the

---

[5]Cuevas argues that he could not have retaliated against Star Towing because Anders did not own Star Towing until after he had already distributed the tickets to the officers. [County-Appellants' Br. at 20]. However, whether the facts underlying the investigation pre-date Anders' ownership of Star Towing is of no consequence. By the time Anders spoke to investigators, he owned both Star Towing and Area Towing, and thus, his protected speech was made as an agent of both companies.

benefit of a fuller factual record, we cannot conclude that Cuevas was objectively reasonable to believe his actions did not violate such clearly established law. The district court, relying on *Marohnic* and *See*, concluded that "[a] reasonable government official would understand that retaliating against an individual for cooperating with law enforcement in an investigation is a violation of clearly established First Amendment rights." We agree.

Assuming Star Towing's allegations are correct in that Cuevas' removal of Star Towing from the non-consent tow list was based on Anders' speech to state investigators, the law was clearly established that so doing would violate the First Amendment. Indeed, our decision in *Lucas*, a case in which we had the benefit of looking at summary judgment evidence, is on point and renders the unlawfulness of such conduct, if true, apparent. *Marohnic* and *See* also provide strong and firmly grounded Circuit precedent identifying that speech made in the context of cooperating with law enforcement is protected under the First Amendment. And, as explained above, the Amended Complaint contains enough factual allegations to find that Anders' speech was a motivating factor in Anders' alleged adverse actions taken against Star Towing.

Cuevas disputes that *Marohnic* and *See* provided him with sufficient notice that he may have been violating the Constitution. He argues that, unlike the plaintiffs in *Marohnic* and *See*, "Anders was not a public employee and was directly involved in the wrongdoing." [County-Appellants' Br. at 15]. However, our cases foreclose any suggestion that these distinctions should alleviate Cuevas' understanding of the clearly established law in this Circuit. Specifically, in *Lucas*, we rejected the argument that only public employees or contractors are entitled to First Amendment protection. 203 F.3d at 972. The truck operator who was removed from the tow list in that case was not classified as either a public employee or public contractor, yet "we conclude[d] that the district court erred in dismissing [the p]laintiffs' retaliation claim on grounds that they were not entitled to First Amendment protection against the retaliatory conduct of the Sheriff's Department." *Id.* at 973. In *Chappel*, we explained that "the argument that an individual's personal motives for speaking may dispositively determine whether that individual's speech addresses a matter of public concern is plainly illogical and contrary to the broader purposes of the First Amendment." 131 F.3d at 574. We found self-interested speech to be protected, because "the First Amendment is concerned not only with a speaker's interest in

speaking, but also with the public's interest in receiving information." *Id.* Coupled together, *Lucas* and *Chappell* do not leave any room for the distinctions advanced by Cuevas.

Factual development of this case might reveal that Anders cooperated with the state investigation in order to insulate himself from any accusation of wrongdoing. However, we cannot make that assumption from the Amended Complaint, and even if we could, Anders' motives underlying his speech should not determine whether it is protected by the First Amendment.

Against the backdrop of this Circuit's precedents, we conclude that a reasonable government officer would have known at the time in question that he would be violating the Constitution if he retaliated against Star Towing for Anders' cooperation with law enforcement. The district court thus did not err in concluding that Appellees' First Amendment right to such speech was clearly established at the time that Star Towing was removed from the list.

### B. Equal Protection Claim Against Cuevas (Count III)

Anders claims that Cuevas' removal of Star Towing from the tow rotation amounts to a "class-of-one" Equal Protection violation. The Equal Protection Clause "prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty.*, 430 F.3d 783, 788 (6th Cir. 2005). The Supreme Court has recognized "successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that [1] she has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). "[T]he class-of-one theory of equal protection . . . presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review. . . ." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 605 (2008). "A 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by 'negati[ng] every conceivable basis which might support' the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005) (quoting *Klimik v. Kent Cnty.*

*Sherriff's Dep't*, 91 F. App'x 396, 400 (6th Cir. 2004) and *Bower v. Vill. Of Mount Sterling*, 44 F. App'x 670, 677-78 (6th Cir. 2004)). It is not necessarily dispositive that the decision at issue was discretionary. *See Franks v. Rubitschun*, 312 F. App'x 764, 766 & n.3 (6th Cir. 2009) (rejecting the argument that "individualized, discretionary decisions can rarely, if ever, be challenged in class-of-one actions").

Here, Anders attempts to negate the primary conceivable basis that might have supported Cuevas' decision by suggesting that Cuevas' primary motivation in removing Star Towing was his harbored resentment towards Anders for cooperating with law enforcement. Cuevas counters by arguing that he—in his role as post commander—had the authority to approve or remove tow companies from the list, and that such discretion is owed constitutional deference under *Engquist*, 553 U.S. 591, which bars public employees from bringing class-of-one claims. [County-Appellants Br. at 22-24]. In *Engquist*, the Supreme Court held that a government employee could not assert a class-of-one claim, because the government can exercise unique discretion as an employer. *Id.* at 599. Noting "the common-sense realization that government offices could not function if every employment decision became a constitutional matter," the Court explained that the "government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large." *Id.* (internal citation omitted).

Here, the district court held that "*Engquist* does not necessarily preclude a class-of-one claim involving other types of discretionary state action, however." [R. 30, PageID 14]. In doing so, the district court concluded that "[Cuevas'] decision [to remove Star Towing] is not so inherently discretionary—akin to an employment decision—so as to preclude Plaintiffs' class-of-one claim as a matter of law at this stage of the proceedings." [R. 30, Page ID 14-15]. Although *Engquist*'s application to Anders' claim presents a potentially complicated issue—one that would certainly require further factual development as to the autonomy with which Cuevas could remove towing companies from the list—we need not address it today, because Anders' class-of-one claim fails for a more fundamental reason.

A class-of-one equal protection claimant must show not just that they were treated differently than others outside of their "class" but that, in comparison to those outside their class,

they were "similarly situated in all relevant respects." *Johnson v. Morales*, 946 F.3d 911, 939 (6th Cir. 2020) (quoting *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 865 (6th Cir. 2012)). Neither the district court—nor Anders—addressed the sufficiency of the Amended Complaint in this respect. However, we do.

Although we accept as true Anders' allegation that the *towing companies* were treated "differently" than other towing vendors, we cannot draw from the Amended Complaint any other facts that would plausibly demonstrate that *Anders himself* was treated differently than other towing company owners, much less that those owners faced similar circumstances. A further examination of Count III of the Amended Complaint reveals that Anders may have intended the "class-of-one" to include both Anders *and* Star Towing. Yet, the title of Count III does not include Star Towing, stating only "Equal Protection Claim 'Class of One'—Plaintiff Anders Was Denied Equal Protection Under the Law Due to The Personal Animus Defendant Cuevas Has Towards Plaintiff Anders." [R. 30, PageID 260].**[6]** If the class of one were to include *both* Anders and Star Towing collectively, they would have to allege that Cuevas was treating all other towing companies *and their owners* differently than Anders and Star Towing. As of now, the threadbare allegation that "Cuevas treated Plaintiffs Anders and Star Towing differently than other towing vendors that were on the non-preference towing rotation list[,]" [R. 30, PageID 266] does not reflect an appropriate class of comparators. Thus, Anders' class-of-one Equal Protection claim is insufficiently pleaded, and we need not address the issue of qualified immunity as to this claim. Accordingly, we will vacate the district court's order on this claim so that Anders may move for leave to amend Count III. We express no opinion as to whether such a motion, if requested, should be granted.

---

**[6]**We place great weight on how Appellees stylize each count in the Amended Complaint. This case involves multiple plaintiffs and multiple defendants, it is critical that all parties have fair notice of which claims apply to them and which parties are bringing those claims. For example, Appellees made clear in the title of Count VI that both Anders and Area Towing, collectively, were bringing that claim. For purposes of consistency, we will assume that if Appellees wanted to include multiple plaintiffs in Count III, then they would have more clearly indicated as much.

## III.   CASE NO. 20-1165 (SOLLARS)

### A.      Absolute Immunity

Sollars contends that, as a matter of law, he enjoys absolute legislative immunity for his veto.  He asserts that in exercising his veto power, he was engaging in an act that was legislative in nature, thereby entitling him to absolute immunity for that act.  We review the district court's denial of absolute immunity *de novo*. *Brookings v. Clunk*, 389 F.3d 614, 617 (6th Cir. 2004) (citing *Barnes v. Winchell*, 105 F.3d 1111, 1115 (6th Cir. 1997)).

Individual members of local governmental bodies, like Sollars, are absolutely immune from suit for damages under § 1983 when conducting "legitimate legislative activity." *Bogan v. Scott-Harris*, 523 U.S. 44, 49, 54 (1988) (quoting *Tenney v. Brandhove*, 342 U.S. 367, 376 (1951)).  Not all governmental acts by local government bodies are necessarily legislative in nature, and "[t]he various activities of most local or municipal officials cannot be characterized as only administrative, legislative, or judicial." *Haskell v. Washington Twp.*, 864 F.2d 1266, 1277-78 (6th Cir. 1988).  However, it is only with respect to the legislative powers delegated to them that an official like Sollars is entitled to absolute immunity. *Bogan*, 523 U.S. at 54. Therefore, the burden rests on Sollars "to establish the existence of absolute legislative immunity." *Canary v. Osborn*, 211 F.3d 324, 328 (6th Cir. 2000).  The existence of that immunity "turns on the nature of the act," not "the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54.  The question before us, therefore, is whether Sollars' veto, when "stripped of all considerations of intent and motive," was legislative rather than administrative or executive. *Id.* at 55.

In *Bogan*, the Supreme Court held that a decision by local legislators to eliminate an employment position from local government was clearly a legislative act. *Id.* at 55-56.  The Court contrasted that situation with "the hiring or firing of a particular employee," which the Court implied was not a legislative act. *Id.*  The distinction, according to the Court, was that the former activity "may have prospective implications that reach well beyond the particular occupant of the office." *Id.* at 56.  *Bogan* informs us that two factors are relevant to determine whether a government official's acts fall within the sphere of legitimate legislative

activity. *Id.* at 54. First, we must consider whether a defendant's actions were legislative in form., *i.e.,* whether "they were integral steps in the legislative process." *Id.* at 55. Second, we must ask whether a defendant's actions were "legislative in substance," *i.e.,* whether the actions "bore all the hallmarks of traditional legislation," including whether they "reflected . . . discretionary, policymaking decision[s] implicating the budgetary priorities" of the government and the services the government provides to its constituents. *Id.* at 55-56.

While the parties do not dispute that Sollars' veto is legislative in form, discovery is necessary before we can determine whether the veto was legislative in substance. *Id.* at 55-56. Sollars maintains that "it is undisputed that the relevant veto dealt with the question of whether towing-services in the City of Taylor should be: (1) awarded *exclusively* to one . . . vendor for a period of three (3) years; or (2) opened up to *multiple* vendors on a yearly basis." [Sollars Reply Br. at 10; emphasis in original]. He further explains that the veto "was a substantively legislative decision for one . . . simple and inescapable reason, *viz. it dealt with the manner in which a key city service (e.g., towing) should be provided to residents*." *Id.* (emphasis in original). These justifications may all prove true and may eventually prove to be grounds for absolute immunity, but the question before us now is whether we can conclude from the allegations *as set forth in the Amended Complaint* that Sollars' veto evidenced a broad-based policy decision to restructure the way in which the city would contract with towing companies. *See Bogan,* 523 U.S. at 54. We cannot.

Instead, the allegations in the Amended Complaint, construed in the light most favorable to Area Towing, suggest that Sollars' veto was nothing more than an attempt to stop the city from contracting with one specific entity—Area Towing. Such a pointed act does not indicate a larger policy goal or budgetary concern and appears more administrative than legislative in character. *See id.* at 56 (noting that while the termination of a position might be legislative in substance because it "may have prospective implications that reach well beyond the particular occupant in office," "the hiring or firing of a particular employee" generally is not); *Canary,* 211 F.3d at 330-31 (concluding that a board's decision not to renew the plaintiff's contract as assistant principal was not legislative in substance because, among other reasons, the Board "was making personalized assessments of individual employees, not engaging in an impersonal

budgetary analysis of various positions" and the decision did not have prospective implications beyond the effect on the plaintiff); *Guidon v. Twp. of Dundee*, 488 F. App'x 27, 33 (6th Cir. 2012) (explaining that while the passing of a zoning ordinance is a legislative act, the denial of a building permit request is an administrative act). Thus, based on what we may consider from the record at this time, we cannot say that Sollars' veto involved the formulation of policy. Nor can we say that the veto applied to the community at large. While Sollars argues that such concerns stem from underlying policy considerations, we see none on the face of the Amended Complaint.[7] On the current record, Sollars is not entitled to absolute immunity.

## B.     Qualified Immunity

Sollars contends, in the alternative, that he enjoys qualified immunity for the veto. As explained above, qualified immunity is a two-part affirmative defense. First, we must decide whether the plaintiff has alleged a violation of a constitutional right. *Cahoo*, 912 F.3d at 897. Second, we decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.* To establish a First Amendment retaliation claim, a § 1983 plaintiff must show that (1) he "engaged in constitutionally protected activity," (2) the defendant took an adverse action that "caused the plaintiff to suffer an injury that would likely chill one of ordinary firmness from continuing to engage in that activity," and (3) "the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010) (citing *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)). The Amended Complaint plausibly alleges all three elements.

---

[7]To bolster his argument that the veto was legislative in nature, Sollars references an April 4, 2018 Fox News 2 article that states:

> The question put before city council Tuesday was the length of the Area Towing contract. Should it be a three-year towing contract with option to extend it to nine or as Mayor Rick Sollars offered, put up the contract for bid each and every year.

[Sollars Reply Br. at 4 n.5 (quoting [R. 34-1, PageID 375-78])]. While this is seemingly presented as evidence in support of Sollars' argument, reference to this particular article is nowhere to be found in the Amended Complaint, and, at the motion-on-the-pleadings stage, the district court correctly disregarded this as a "matter[] outside the pleadings." *See Greenberg v. Life Ins. Co of Va.*, 177 F. 3d 507, 514 (6th Cir. 1999). If the district court were to have considered the article—and its unsworn assertions—the district court would have risked converting the motion for judgment on the pleadings into a motion for summary judgment. *Id.* This Court thus sees no basis upon which we can currently consider this article or any other evidence in support of Sollars' argument suggesting that his veto was in furtherance of the City's "eliminat[ion of] the practice of awarding three (3) year exclusive contracts to towing-companies—including but *not* limited to, Area Towing." [Sollars Br. at 14 n. 22 (emphasis in original)]. We cannot infer the existence of this policy anywhere within the four corners of the Amended Complaint.

Sollars does not contest that Appellees have alleged causation or protected activity; rather, he argues only that the non-renewal of Area Towing's contract is not an adverse action. The district court rejected that argument, concluding that "[a]lthough Area Towing continues to do business with the city, the court cannot find that the loss of the security and stability of a three-year contract is so inconsequential as to warrant dismissal at this stage of the proceedings." **[R. 30, PageID 428].**  This Court has described an adverse action as "one that is '*capable* of deterring a person of ordinary firmness' from exercising the constitutional right in question." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (citation omitted).  We have also held that nothing justifies "harassing people for exercising their constitutional rights[.]"  *Thaddeus-X*, 175 F.3d at 397 (citation omitted).

*We agree with the district court that, for purposes of identifying an adverse action, there is a difference between a three-year contract and a month-to-month business relationship. A month-to-month arrangement* provides the city with great latitude, limited to narrowly tailored exceptions, to move from Area Towing whenever it might be convenient to the city, whereas a three-year contract provides a predictable framework to govern the parties' long-term relationship.  The difference in risking the latter and reverting to the former is significant enough to *"deter a person of ordinary firmness from continuing to engage in the protected activity." Siggers-El v. Barlow, 412 F.3d 693, 702 (6th Cir. 2005).  A continued business relationship, alone, does not negate a finding of adverse action.  See Thaddeus-X*, 175 F.3d at 396 ("The term 'adverse action' is drawn from employment case law; examples in that context include discharge, demotions, refusal to hire, *nonrenewal of contracts*, and failure to promote." (emphasis added)). Because Sollars concedes the other elements of Appellees' retaliation claim, we find that Area Towing has plausibly alleged a constitutional violation by Sollars.

As to the second prong of the qualified immunity test, Sollars contends that "it was not 'clearly established' in 2018 that an analogous veto could give rise to a viable § 1983 claim." [Sollars Br. at 16].  To avoid a finding of qualified immunity, however, Appellees need not point to a Sixth Circuit case with facts necessarily involving a mayor's veto, as opposed to some other action pursuant to his official duties. *See Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 684 (6th Cir. 2013) ("[E]ven in cases involving less than outrageous conduct, 'officials can still be on

notice that their conduct violates established law in novel factual circumstances.'" (quoting *Safford Unified Sch. Dist. No. 1. v. Redding*, 557 U.S. 364, 377-78 (2009)).

Area Towing alleges that Sollars' veto was in retaliation for (1) Anders' refusal to contribute to Sollars' political campaign, (2) Anders' complaints about having to use Fiore's company, and (3) Anders' cooperation with the FBI and U.S. Attorney's Office. [R. 30, PageID 277-78]. Each of these protected forms of speech implicate well-known First Amendment rights embedded in both Supreme Court and Sixth Circuit precedent.

It is well-established that the refusal to contribute to a political campaign is a First Amendment-protected activity. *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 720 (1996) is directly on point. That case involved an analogous claim of retaliation brought by a towing company alleging that it was removed from a city towing list because it refused the new mayor's request for a campaign contribution. *Id.* The Court explained:

> We cannot accept the proposition . . . that those who perform the government's work outside the formal employment relationship are subject to what we conclude is the direct and specific abridgement of First Amendment rights described in this complaint. As respondents offer no justifications for their actions, save for insisting on their right to condition a continuing relationship on political fealty, we hold that the complaint states an actionable First Amendment claim.

*Id.* We embraced *O'Hare* in *Lucas*, 203 F.3d at 977, where we found that the plaintiffs provided evidence of First Amendment retaliation by showcasing that the sheriff gave more business to towing companies who donated to his campaign. Coupled with the fact that the plaintiffs were removed from the tow call list, we explained that "not only may this conduct itself constitute a violation of the First Amendment, but it provides strong evidence that, as a general rule, a wrecker service's political support for the Sheriff (or lack thereof) factors heavily into the Sheriff's administration of the tow call list." *Id.* *See also Sowards v. Loudon Cnty.*, 203 F.3d 426, 439 (6th Cir. 2000) ("The right of political association with a particular campaign is a clearly established right."). Under *O'Hare* and *Lucas*, a reasonable government official would understand Anders' refusal to donate to Sollars to be protected speech.

It is also well-established that "[t]he freedom of speech . . . protects the right of an ordinary citizen to criticize public officials, again generally without fear of criminal or civil

repercussions." *Rudd*, 977 F.3d at 513. "Today, countless decisions make clear that '[c]riticism of government is at the very center of the constitutionally protected area of free discussion.'" *Id.* at 514 (alteration in original) (quoting *Barrett v. Harrington*, 130 F.3d 246, 262 (6th Cir. 1997)). We applied these principles in *Lucas*, where we found a First Amendment violation when the county removed plaintiffs from the towing list after "[the plaintiffs' owner] repeatedly accused the Sheriff of favoritism, lack of competition and unfairness in his administration of the tow call list[.]" 203 F.3d at 973. Likewise, here, a reasonable government officer would understand that Anders was engaging in protected speech when he voiced his criticism of Taylor officials for forcing him to work with Fiore.

Finally, it is well-established that cooperation with law enforcement is a First Amendment-protected activity. "The First Amendment protects speech that may be 'fairly characterized as constituting speech on a matter of public concern.'" *Id.* at 973 (quoting *Chappel*, 131 F.3d at 573). "In order to conclude that speech addresses a matter of public concern, this court must be able to fairly characterize the expression as relating to any matter of political, social, or other concern to the community." *Id.* at 973 (citations omitted). "[A]llegations of corrupt practices by government officials," like those alleged here, "are of the utmost public concern." *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1061 (3d Cir. 1989). And, as we explained above, *Marohnic* and *See* provide ample support that retaliation for cooperation with law enforcement amounts to a violation of a clearly established right.

Here, Anders' speech—as alleged—was "made in the context of [an] investigation" into Fiore, and by cooperating with law enforcement, Anders was helping illuminate investigators as to "possible corruption" concerning the city's favoritism towards Fiore. A reasonable government officer would understand that this activity fits squarely within the type of speech that we deemed to be protected in *Marohnic* and *See*.

Regarding whether Sollars' veto would be a known form of retaliation for these alleged protected activities, we note that "it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983." *Barrett*, 130 F.3d at 264. Although it is hard to know all the precise details of the situation

Sollars faced at the time of the veto, his actions—as alleged—plausibly amount to a violation of Area Towing's clearly established rights.

## IV.  CASE NO. 20-1166 (RAMIK)

We also have jurisdiction to review the district court's denial of governmental immunity under Michigan law on Anders' and Area Towing's defamation claims against Ramik. *See Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407-08 (6th Cir. 2007) ("[W]e have held repeatedly that, because the denial of governmental immunity is now a 'final order' providing defendants with an appeal of right to the Michigan Court of Appeals, this court has jurisdiction over interlocutory appeals concerning pendent state law claims of governmental immunity."). We review *de novo* the question of whether a defendant is entitled to governmental immunity under Michigan law. *Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012) (citing *Herman v. City of Detroit*, 680 N.W.2d 71, 74 (Mich. App. 2004)).

Here, Anders and Area Towing allege that Ramik made false and defamatory statements that were aired on Fox 2 News and stated publicly throughout the community. Specifically, they allege that Ramik "falsely stated that he had received a lot of complaints from residents about Plaintiff Area [Towing] and further accused Plaintiff Anders of victimizing and stealing from the residents of the Defendant City." [R. 30, PageID 39]. Anders and Area Towing further allege that "Ramik openly bragged to city officials and residents that he was going to 'destroy' Plaintiffs Anders and Area Towing and further publicly called Plaintiff Anders a 'crook.'" *Id.*

Under Michigan law, the elements of a defamation claim are: (1) a false and defamatory statement about the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) actionability of the statement irrespective of special harm (defamation *per se*) or the existence of special harm caused by publication. *Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005).

Ramik argues that his alleged statements could not have been defamatory because he was merely "relaying information" from a "concerned, non-party citizen." [Ramik Br. at 13]. As an initial matter, we cannot glean from the Amended Complaint what source, if any, was the basis

of Ramik's statements. For that reason alone, Ramik's argument fails at this stage.**[8]** We also reject Ramik's argument that his statements—as alleged in the Amended Complaint—were simply opinion. While the First Amendment does provide vast protection for expressions of opinion, "[t]erms such as 'blackmailer,' 'traitor,' 'crook,' 'steal,' and 'criminal activities' must be read in context to determine whether they are merely exaggerations of the type often used in public commentary." *Ghanam v. Does*, 845 N.W.2d 128, 144 (Mich. App. 2014) (citing *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) and *Kevorkian v. American Med. Ass'n*, 602 N.W.2d 233 (1999)). The facts suggest that Ramik was accusing Anders and Area Towing of theft and referenced particular conduct to support that accusation. The fact-finding process might reveal that Ramik's statements were "merely 'rhetorical hyperbole' meant to express strong disapproval rather than an accusation of criminal activity or actual misconduct," *Id.* at 144 (quoting *Greenbelt*, 398 U.S. at 14), but we cannot make that determination right now.

Ramik further contends that the district court erred in denying him governmental immunity under Michigan Compiled Laws (M.C.L.) § 691.1407(5), which provides:

> A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority.

The district court concluded that dismissal of the defamation claim was inappropriate, because "the factual context surrounding Ramik's statements is not clear." [R. 40, PageID 18]. We agree.

---

**[8]**Even if we were to accept Ramik's allegation as true—and, again, we cannot—his reliance on *Wilson v. Sparrow Health Sys.*, 799 N.W.2d 224 (Mich. App. 2010) is misplaced. In that case, after the benefit of some discovery, the court dismissed the plaintiff-health-club-member's defamation claim that was based on the defendant-health-club's statement that the plaintiff was a suspect in an indecent exposure investigation in which he was ultimately cleared. *Id.* at 225-26. After a police investigation, the defendant distributed a memorandum to its managers and lifeguards as to how they should handle indecent exposure incidents. *Id.* at 227. In the memorandum, the club identified the plaintiff as a previously identified suspect of such exposures. *Id.* The court held that the statements about the plaintiff "were neither false nor defamatory[,]" because the plaintiff "was, in fact, a suspect in the indecent-exposure incidents when the memorandum was created and circulated and the memorandum specifically stated that he was a *suspect*, not the person who had committed the acts." *Id.* at 228. *Wilson* merely reiterates hornbook law that the truth is a defense to a defamation claim under Michigan law. It does not stand for the sweeping proposition that simply relying on "relayed information"—even if false—can insulate a party from a defamation claim.

The Michigan Supreme Court has noted that the state's highest-level executive officials do not enjoy immunity for acts outside their executive authority:

> The determination whether particular acts are within their authority depends on a number of factors, including the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official's authority, and the structure and allocation of powers in the particular level of government.

*Marrocco v. Randlett*, 433 N.W.2d 68, 73 (Mich. 1988).

The Court cannot definitively evaluate many of these factors based solely on the allegations in the Amended Complaint. For example, the Amended Complaint states that Ramik made the statements in question during a news interview and not during official city council proceedings. Additionally, the Amended Complaint does not mention, nor does Ramik cite, any "acts, . . . charter, ordinances, or other local law" to suggest that Ramik's statements were made pursuant to his official authority. Ramik contends that *Chupa v. Moceri* supports the application of governmental immunity in this instance. No. 288347, 2010 WL 746243, at *4 (Mich. App. Mar. 4, 2010). In that case, the court dismissed defamation claims against city council members for allegedly defamatory statements made in a local newspaper. The Michigan Court of Appeals held that governmental immunity applied to the statements, stating, in pertinent part:

> Although the circumstances of when the individual defendants made the statements that appeared in the newspaper articles are unknown, it is clear from the statements themselves that the individual defendants were speaking of matters that were before the City Council[.]

*Id.* Ramik argues that *Chupa* applies to his statements, because he was merely referring to the renewal of Area Towing's contract, which was a matter that was pending before the Taylor City Council. While Ramik's statements may have been made against the *backdrop* of the Council's consideration of Area Towing's contract, it is not "clear," *see id.*, from the Amended Complaint that he made those statements to address that matter. Indeed, the word "contract" does not even appear in Count VI of the Amended Complaint.**9**

---

**9**Ramik points to a Fox News 2 article dated April 4, 2018 in an attempt to further illuminate the nature of his statements. [Ramik Brief at 12 n.16]. The district court did not consider this exhibit, because it "does not appear to be the identical story referred to in the complaint, which aired on March 27, 2018." [R. 40, PageID 16]. In doing

Further, the context and circumstances regarding the precise topics addressed in the Fox News 2 interview are even less clear, particularly considering the allegation that Ramik himself solicited Fox News 2 to do the story. Discovery might reveal that Ramik made the statements in furtherance of the city council's deliberations about the city's business relationship with Area Towing, but that is not an inference that we are permitted to make at this stage of the proceedings. Ramik offers no support to suggest that governmental immunity is a license to make defamatory statements about matters not before the city council simply because the individuals or entities defamed are the *subject* of official city council business. Viewing the allegations in the light most favorable to Anders and Area Towing, it is not apparent that Ramik is entitled to governmental immunity at this time.

## V. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court as to Area Towing's claim against Hall (Count II); **VACATE** the judgment of the district court as to Anders' Equal Protection claim against Cuevas (Count III); **AFFIRM** the judgment of the district court as to Appellees' remaining claims (Counts I, IV, and VI); and **REMAND** this case for proceedings consistent with this opinion.

---

so, the district court acted within its discretion under Fed. R. Civ. P. 12(c) in excluding the April 4, 2018 article from consideration. *See Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 503 (6th Cir. 2006).